IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Crim. No. 24-423-2** |
| | : | |
| HAKIM LEDBETTER | : | |
| | : | |

---

**Diamond, J.**                                                                    **April 2, 2026**

**<u>MEMORANDUM</u>**

In this gun and drug prosecution, the defense sought to present the "expert" opinion of Chuck Rylant, Psy.D., respecting the psychology of Defendant, Hakim Ledbetter.  I conducted a pre-trial <u>Daubert</u> hearing, where Rylant's often evasive and incredible testimony confirmed that his "expert" opinion meets none of Rule 702's requirements: (1) Rylant has never practiced as a psychologist, and received his graduate degree from an unaccredited, online school; (2) he neither described his methodology nor set out an adequate basis for his opinion; and (3) admitting his opinion would likely invite the admission of Ledbetter's serious criminal record —hardly a good fit.  Fed. R. Evid. 702.  Also concluding that Rylant's opinion did not pass muster under Rules 704(b) and 403, I precluded Rylant from testifying at trial and stated that I would issue this Memorandum to explain my decision more fully.  (Doc. Nos. 113, 114.)

## I.      BACKGROUND

On October 15, 2024, Pennsylvania State Police seized three UPS packages containing 14 kilograms of powder cocaine, 14 pounds of methamphetamine, and 3000 grams of phencyclidine ("PCP")—with a combined street value of over $1,000,000.  (Doc. Nos. 90 at 2, 103 at 2.) Placing GPS trackers in the packages, police made a "controlled delivery" to Desiree Davis. (Doc. Nos. 90 at 2, 103 at 2–3.)  With police covertly following her, Davis drove to the North Dover Street, Philadelphia home of Ledbetter's co-defendant, Lloyd Pettus, where the packages

were placed in a Dodge truck.  (Doc. Nos. 90 at 2, 103 at 2–3, Doc. No. 136 ("D. Tr.") 17:13–17.)

Police saw Ledbetter trying to drive the truck through a narrow passageway to the street. (Doc. Nos. 90 at 2, 103 at 3.)  Pettus was giving Ledbetter directions with hand gestures.  (Doc. Nos. 90 at 2, 103 at 3.)  Wearing clearly marked "State Police" vests, officers converged on the truck.  (Doc. Nos. 90 at 2, 103 at 3; D. Tr. 78:10–11.)  Pettus immediately ran up the block, where he was caught and arrested.  (Doc. No. 103 at 3.)  Ledbetter accelerated and reversed the truck into a parked car and then crashed into a utility pole.  (Id.; Doc. No. 90 at 2.)  After State Police rammed the passenger side of the Dodge, Ledbetter bolted from the vehicle, and was pursued, caught, and arrested.  (Doc. No. 90 at 2.)

When police searched the Dodge, they found the three packages in the cargo area, and recovered three loaded handguns and loose ammunition immediately behind the driver's seat. (Doc. No. 103 at 3–4.)  Ledbetter was subsequently charged with: attempted possession with intent to distribute 500 grams or more of methamphetamine, 5 kilograms or more of cocaine, and 1,000 grams or more of PCP and aiding and abetting; possession of a firearm in furtherance of a drug trafficking crime; and possession of a firearm by a felon.  (Doc. No. 39-1); 21 U.S.C. §§ 841(a)(1), (b)(1)(A); 21 U.S.C. § 846; 18 U.S.C. § 2; 18 U.S.C. § 924(c)(1)(A)(i); 18 U.S.C. § 922(g)(1).

The Government intended to present at trial evidence of Ledbetter's flight, and "argue that his flight establishes his consciousness of guilt."  (Doc. No. 90 at 13.)  Ledbetter thus sought to introduce Rylant's testimony "regarding psychological and physiological factors that affect human responses to threatening stimul[i]," so that the jury could "understand alternative reasons for flight in situations of perceived threat."  (Doc. Nos. 90-1 at 2, 95 at 1.)

2

Rylant is a former police officer who has apparently testified as a "civilian self-defense and law enforcement use-of-force expert since 2014." (Doc. No. 90-1 at 2.)  He did not earn a Psy.D. until 2020, however.  (Doc. No. 95-1 at 2; D. Tr. 54:9–15, 55:3–9.)   That degree notwithstanding, Rylant is "not a psychologist," and has never treated a patient.  (D. Tr. 54:19–55:1, 55:11–12.)  He described his dissertation—"Police Use of Force Decisions: Psychological and Physiological Factors Affecting Performance Under Pressure"—as a "qualitative systematic literature review" that involved no human participants and included no original data.  (Doc. No. 95-3 at 74, 77, 79.)   There, as in virtually all Rylant's publications and presentations, he addresses only police use of force, not how a witness to that use of force might respond.  (See Doc. Nos. 95-3, 95-1.)

The Government moved *in limine* to exclude Rylant's testimony, or in the alternative, for a pretrial Daubert Hearing, arguing that his opinion is irrelevant and inadmissible under Rules 702, 704, 403, and Daubert itself.  (Doc. No. 90); Fed. R. Evid. 403, 702, 704; 509 U.S. 579 (1993).

At the January 28 Daubert Hearing, Rylant, who, at Defendant's request, appeared via Zoom, offered highly dubious testimony.  (D. Tr. 5:2–3.)  For instance, he purportedly could not recall how many times he had been qualified as an expert in a federal criminal case, his fee arrangement in the instant case, or whether his travel costs in the instant case would be reimbursed.  (D. Tr. at 11:20–24, 62:16–24, 63:7–11.)  Even more incredibly, he testified that he did not know whether a court had ever refused to qualify him as an expert.  (Id. at 56:6–22.)

Finally, Rylant sought to opine that "the circumstances under which Mr. Ledbetter was apprehended and arrested were such that a person in Mr. Ledbetter's position could have attempted to flee as a result of the aforementioned psychological and physiological effects and

3

phenomena rather than because of a guilty conscience." (D. Tr. 52:11–22; Doc. No. 90-2 at 1.) Yet, as I discuss below, Rylant formulated this opinion ignorant of almost all "the circumstances under which Mr. Ledbetter was apprehended and arrested." (D. Tr. 52:11–22.)

At the final pretrial conference, I granted the Government's Motion to preclude Rylant's trial testimony. (Doc. No. 114.) After a seven-day trial—at which Ledbetter did not testify—the jury convicted him of all charges. (Doc. No. 130.)

## II.    LEGAL STANDARDS

### A.    Rule 702

When serving as gatekeeper, I may admit only reliable scientific or technical testimony and evidence, and must ensure that a proffered expert, "whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Daubert, 509 U.S. at 589; Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999); Fed. R. Evid. 702.

Rule 702 "contains 'three distinct substantive restrictions on the admission of'" expert testimony: "'qualifications, reliability, and fit.'" Cohen v. Cohen, 125 F.4th 454, 460 (3d Cir. 2025) (quoting Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000)). "The party offering the expert testimony has the burden of establishing that the proffered testimony meets each of the three requirements by a preponderance of the evidence." ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc., 198 F. Supp. 2d 598, 602 (E.D. Pa. 2002) (citing Padillas v. Stork–Gamco, Inc., 186 F.3d 412, 418 (3d Cir.1999)).

### B.    Rule 704

This Rule provides that:

> No expert witness testifying with respect to the mental state or condition
> of a defendant in a criminal case may state an opinion or inference as to

4

whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto.

Fed. R. Evid. 704(b). The Rule thus "prohibits 'testimony from which it necessarily follows, if the testimony is credited, that the defendant did or did not possess the requisite mens rea.'" U.S. v. Bennett, 161 F.3d 171, 182 (3d Cir. 1998) (quoting U.S. v. Morales, 108 F.3d 1031, 1037 (9th Cir.1997)). Rule 704(b) may also "be violated when the [attorney's] question is plainly designed to elicit the expert's testimony about the mental state of the defendant or when the expert triggers the application of Rule 704(b) by directly referring to the defendant's intent, mental state, or mens rea." United States v. Watson, 260 F.3d 301, 309 (3d Cir. 2001) (internal citations omitted).

### C.      Rule 403

The Court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; United States v. Bailey, 840 F.3d 99, 117 (3d Cir. 2016).

## III.    DISCUSSION

Rylant's "expert" opinion is inadmissible under Rules 702, 704, and 403. He lacks the qualifications to offer that opinion, which would be a poor fit for this case. Moreover, Rylant impermissibly seeks to opine that Ledbetter lacked mens rea.

### A.      Rule 702

Ledbetter failed to show that Rylant's proposed testimony satisfies any of the Rule's requirements.

#### *Qualifications*

"Rule 702 requires the witness to have 'specialized knowledge' regarding the area of

testimony." Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998). Although the qualification requirement is a "liberal" one, the proffered expert witness "'must possess skill or knowledge greater than the average layman.'" Id. (quoting Aloe Coal Co. v. Clark Equip. Co., 816 F.2d 110, 114 (3d Cir. 1987)). "An expert may be generally qualified but may lack qualifications to testify outside his area of expertise." Calhoun v. Yamaha Motor Corp., 350 F.3d 316, 322–23 (3d Cir. 2003).

Even under the Third Circuit's liberal approach, Rylant is not qualified to testify as to Ledbetter's psychology. Rylant received his "Psy.D." degree from "California Southern University," an exclusively online, unaccredited school. (Doc. Nos. 95-1 at 2, 95-4 at 2; D. Tr. 54:9–15, 55:3–9.) Rylant purports to be an expert on "the psychological and physiological limitations of what humans are capable of." (Doc. No. 95-1 at 2; D. Tr. 21:8–13.) Yet, the defense presented nothing to establish that Rylant is trained to evaluate the psychological basis for a suspect's flight from the police. Most of Rylant's teaching and lecturing occurred when he had earned only an MBA degree—well before he received his "Psy.D." in 2020. (Doc. No. 95-1 at 2–3, 9–13.) Rylant's *curriculum vitae* confirms that his specialty is limited to police use of force decisions and self-defense. (See Doc. No. 95-1; D. Tr. 66:23.) Indeed, Rylant made the great majority of his presentations to police groups on these two topics. (Doc. No. 95-1 at 9–13.) Rylant's dissertation appears to be similarly limited. (See Doc. No. 95-3; D. Tr. 7:6–9 ("I did my focus on police use of force decision making, specifically the psychological and physiological factors that affect officers during use of force situations.").) Yet, this case does not concern whether police use of force was reasonable, but whether Ledbetter's flight from police showed consciousness of guilt. See Fedor v. Freightliner, Inc., 193 F. Supp. 2d 820, 828 (E.D. Pa. 2002) (an expert's "specialized knowledge must be relevant to the area of inquiry").

6

Rylant's "specialized knowledge" otherwise has nothing to do with Ledbetter or this case. His work on police use of force aside, Rylant has authored two series of books: one titled "How to Be Rich," and the other, a jiu-jitsu primer. (D. Tr. 66:11–67:9.)

Rylant purportedly could not recall in how many federal criminal cases he was qualified to testify as an expert. Although he initially said that his "understanding" was five cases, he then acknowledged it was three. (D. Tr. 10:23–12:4.) In those cases, he opined only on the decision to use force. See United States v. Garrity, No. 23-08139, 2025 WL 879979, at *3 (D. Ariz. Mar. 21, 2025) (permitting Rylant to testify "on the broad subjects of his expertise" when the jury had to determine whether the defendant's use of deadly force was justified); United States v. Tisby, No. 22-88, Daubert Hearing Tr. at 39, 107 (D. Nev. May 9, 2023) (permitting Rylant to testify when what was "really at issue" was whether the defendant "acted in self-defense" when he assaulted police); United States v. Wise, No. 23-184, Daubert Hearing Tr. at 6:18–22 (D.D.C. Nov. 7, 2024) (seeking to opine that a police officer "could reasonably perceive there was excessive force occurring").

Finally, Rylant acknowledged that he had never before offered an expert opinion on the psychological reasons for a person's flight from police. (See D. Tr. 13:21–14:2 ("I don't think there's been any [case] where I've actually testified specifically to that topic."), 72:4–73:1).

*Reliability*

Reliability "means that the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 (3d Cir. 1994) (quoting Daubert, 509 U.S. at 590).

Rylant did not base his "expert" opinion respecting flight from police on reliable

7

methodology.  Indeed, Rylant never explained his methodology.  See Greenwald Caterers Inc. v. Lancaster Host, LLC, 699 F. Supp. 3d 382, 399 (E.D. Pa. 2023) ("It is not enough for an expert to state the information [he] considered and then state [his] conclusion—Rule 702 requires an intermediate step of setting forth a comprehensible methodology capable of transforming information into a conclusion."); Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").  He never spoke with Ledbetter or anyone else about why Ledbetter fled.  (D. Tr. 23:9, 74:4–8, 75:2–7.)  He never visited the neighborhood where Ledbetter was arrested.  (Id. 74:9–14.)  Indeed, although he purported to be uncertain, he apparently has never visited Philadelphia.  (Id. 74:15–24.) Rylant offered no studies that he or anyone else conducted about flight from police.  (See Doc. No. 90-1 at 10–15.)  Moreover, Rylant and defense counsel contradicted themselves and each other respecting the basis of his "expert" opinion.  Rylant initially testified that that he had based his opinion on the following two paragraphs of a State Police report:

> Law enforcement personnel maintained surveillance at the 3230 N. Dover Street at approximately 1815 hours. Electronic surveillance equipment indicated that the delivered partials were moving.  All three (3) parcels appeared to have been moved to the rear alley of 3230 N. Dover Street. Surveillance members then moved to the rear alley and observed a black male on foot assisting the operator of a Dodge Ram bearing Pennsylvania registration ZVG-7540 in exiting the alley.  Law enforcement personnel then approached the black male and the operator of the Dodge.  It was at this time the black male fled the scene on foot and began running north on N. 29th Street towards W. Hunting Park Avenue.  After a brief foot pursuit, the black male was taken into custody and identified as Lloyd Farris Pettus through a Pennsylvania driver's license.
>
> After Pettus fled on foot, the operator of the Dodge attempted to back up and flee in the vehicle but was unsuccessful.  The operator of the Dodge then accelerated forward and struck a parked vehicle.  The operator of the

> Dodge again tried to reverse out of the alley but was eventually boxed in by law enforcement personnel. The operator of the Dodge then exited the vehicle and fled the scene on foot. The operator of the Dodge was taken into custody at the intersection of N. 29th Street and W. Allegheny Avenue. The operator of the Dodge was identified as Hakim Jamar Ledbetter through a Georgia driver's license. Recovered from Ledbetter's person was a black iPhone in a black case and a black iPhone in a silver case.

(D. Ex. 3 at 212; D. Tr. 14:9–18, 17:9–18:16.)

The inadequacy of these two paragraphs to serve as a basis for Rylant's opinion quickly became evident. The paragraphs do not disclose how many officers were involved, whether they were in uniform, whether they had drawn their weapons, whether they gave any commands to the driver or Pettus, the driver's race, or how far the driver ran when he bolted from the Dodge. As these shortcomings were pointed out, Rylant "revised" his testimony, stating that he also had looked at police "photos" taken after Ledbetter's arrest. (Id. 20:2–7, 30:20–32:6.) Remarkably, counsel then contradicted Rylant, stating "I don't think [the photos are] relevant to [Rylant's] opinion," reiterating that Rylant based his opinion only on the two paragraphs I have quoted. (Id. 20:13–21:5.) More remarkably, Rylant then again "revised" his testimony ("Let me correct myself"), now stating that he also based his opinion on the photos and "the [post-arrest] video of [a police] bodycam." (Id. 25:23–25.) Counsel then "revised" her previous statement, now suggesting that Rylant based his opinions on the police photos and video. (Id. 26:21–27:1.)

I do not credit the shifting testimony and explanations of Rylant or counsel. Rather, I find that Rylant based his opinion solely on the two paragraphs of the State Police report. Rylant and counsel repeatedly changed their descriptions of the opinion's basis because, as I have discussed, the two paragraphs do not support Rylant's opinion.

Finally, Rylant's "expert report"—which he drafted in an hour—was exceedingly

9

general, including virtually no mention of the facts of this case.  (Id. 61:17–18; see Doc. No. 90-1.)  Indeed, Rylant testified that he had essentially cut and pasted his Ledbetter report from strikingly similar reports he had prepared for other cases having nothing to do with flight from the police.  (D. Tr. 69:11–18 ("Q: So your report includes information that is identical to what's been provided in other reports that you've written, correct? A: Often the same, yes."); see Doc. Nos. 90-3, 90-4.)

In these circumstances, I was compelled to find that Rylant's proposed testimony was not reliable.  See R.D. v. Shohola, Inc., No. 16-01056, 2019 WL 6053223, at *11 (M.D. Pa. Nov. 15, 2019) (excluding psychologist's expert testimony because she "never examined" the plaintiff, stated her views "as a series of conjectural hypotheses," and much she would address was "well within the ken of a lay jury").

*Fit – Rule 403*

"[A]n expert's testimony 'fits' the proceedings" if "it 'will help the trier of fact to understand the evidence or to determine a fact in issue.'"  UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres, 949 F.3d 825, 835 (3d Cir. 2020) (quoting Fed. R. Evid. 702(a)).  "'This condition goes primarily to relevance.'"  In re TMI Litig., 193 F.3d 613, 663 (3d Cir. 1999) (quoting Daubert, 509 U.S. at 591), amended, 199 F.3d 158 (3d Cir. 2000).  "[E]ven if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge *for purposes of the case*."  Paoli, 35 F.3d at 734 (emphasis in original).

It is apparent that the "fit" of Rylant's opinion to Ledbetter is poor.  He sought to opine that something (which he never clearly identified) other than consciousness of guilt could cause someone in Ledbetter's circumstances to flee in the manner Ledbetter did.  Yet, in forming this

opinion, Rylant was ignorant of circumstances that could well have caused Ledbetter to flee from the police.  On October 15, 2024, Ledbetter:

- was in violation of his parole because he had left the state of Georgia;

- effectively possessed three loaded handguns;

- as a parolee, and a convicted felon, was prohibited from possessing any weapons;

- was driving a truck containing drugs valued at over $1 million;

- had previously fled from police when they executed a warrant;

- had previously been convicted of federal drug charges; and

- had previously shot someone and been convicted of aggravated assault.

(D. Tr. 80:1–81:21.)

When asked whether these seven factors altered his opinion that Ledbetter's flight was innocent, Rylant was evasive:

> I think [the] new information is certainly relevant.  That would be to take it into consideration.

(Id. 82:7–22.)  Rylant then reluctantly acknowledged that this new information could have provided reasons for why someone in Ledbetter's circumstances would run from police.  (Id. 83:2–22.)

It is thus evident that the admission of Rylant's "expert" opinion that Ledbetter's flight was innocent could well open the door to the seven less than innocent factors the Government believed caused Ledbetter to flee.  See United States v. Caldwell, 760 F.3d 267, 281 (3d Cir. 2014) ("Situations may indeed arise where the content of a defendant's trial testimony transforms a previously irrelevant 404(b) purpose into a material issue in a case.").  Indeed, defense counsel acknowledged that the introduction of the seven factors would necessitate a Rule 403 analysis.  (D. Tr. 85:4–16.)  Such an analysis would almost certainly bar admission of

11

Rylant's opinion.

The potential for prejudice and jury confusion arising from the Government's "other reasons for flight evidence"—with its attendant cautionary instructions—would plainly outweigh the probative value of Rylant's unreliable opinion, which he was not qualified to give. See United States v. Kemp, 362 F. Supp. 2d 591, 597 (E.D. Pa. 2005) (excluding evidence under Rule 403 where "[t]he Court [did] not believe it [could] easily draw a line, if the government's evidence is allowed to be introduced, where [the defendants] would have to stop in cross examining the [witness] and/or presenting their own evidence" in rebuttal); Chanbond, LLC v. Atl. Broadband Grp., LLC, No. 15-842, 2021 WL 1539182, at *4 (D. Del. Apr. 19, 2021) (excluding testimony that had "at most little probative value, which [was] substantially outweighed by the risk of unfair prejudice, confusion, and waste of time, as the introduction of such testimony would open the door to arguments about" a collateral issue, "which . . . the jury would not otherwise hear about").

In these circumstances, I found that the "fit" of Rylant's opinion to be poor: admission of the opinion would not help the jury "understand the evidence or . . . determine a fact in issue." Fed. R. Evid. 702(a).

### B.    Rule 704

The Supreme Court held in 2024 that "[a]n expert's conclusion that 'most people' in a group have a particular mental state is not an opinion about 'the defendant' and thus does not violate Rule 704(b)." Diaz v. United States, 602 U.S. 526, 534, 538 (2024) (expert witness could testify that "in most circumstances, the driver knows they are hired . . . to take the drugs from point A to point B").

It is apparent that Rylant and defense counsel were caught between a rock (the limitation

that Rule 704 and <u>Diaz</u> impose on expert testimony about a defendant's mental state) and a hard place (the need for Rylant's opinion to bear some relationship to the particular circumstances of Ledbetter's flight).  That is certainly another reason why Rylant and defense counsel repeatedly "revised" their descriptions of the basis of Rylant's opinion.  Moreover, although Rylant paid lip service to <u>Diaz</u>, he could not avoid opining on Ledbetter's mens rea.  (<u>See</u> D. Tr. 59:23–24 ("I have no intention of testifying about anyone's state of mind."); <u>id.</u> 53:3–6 ("I'm explaining how humans function psychologically and physiologically. I cannot read any individual's mind.  So I cannot testify to what's in that individual's mind.")); <u>see</u> <u>Diaz</u>, 602 U.S. 526.  For instance, when asked by defense counsel whether Ledbetter may have experienced a "fight or flight response," "without a consciousness of guilt being present," Rylant agreed that it was "possible."  (<u>Id.</u> 53:13–18.)

Even after <u>Diaz,</u> Rule 704(b) still prohibits an expert from opining about the "possible" mental state of a defendant.  <u>See</u> <u>United States v. Malik</u>, No. 19-518-3, 2025 WL 639329, at *1 (E.D. Pa. Feb. 26, 2025) (expert opinion about what someone "like" the defendant "would do when presented with the instant circumstances alleged" went "much further" than <u>Diaz</u> permits); <u>United States v. Savani</u>, No. 23-16, 2026 WL 74610, at *3 (E.D. Pa. Jan. 9, 2026) ("Opinions on whether specific conduct of the Defendants is consistent with money laundering . . . imply opinions on the mental states or intentions of the Defendants in violation of Rule 704(b)[.]").  Accordingly, I determined that the defense's attempt to end-run Rule 704(b) was impermissible.

13

## IV.    CONCLUSION

The Evidence Rules and <u>Daubert</u> criteria were intended to disqualify bogus "experts" like Chuck Rylant.  Although proffered to opine on Hakim Ledbetter's psychology, Rylant is not and has never been a psychologist.  His "Psy.D." was conferred in 2020 by an unaccredited, exclusively online institution.  He appears never to have testified, written, or lectured on the issue he was called to address: the psychology of a suspect fleeing from police.  The three federal cases in which he purportedly testified bear no resemblance to <u>Ledbetter</u>.  Rylant's methodology is unknown.  Although he purported to base his opinion only on generalities, he "revised" that basis and impermissibly strayed into his belief that Defendant lacked mens rea in fleeing from police.  Admitting Rylant's opinion would thus likely open the door to other explanations—highly damaging to Ledbetter—about why he fled, as well as cautionary instructions, which would certainly confuse the jury.  Finally, to obscure these many failings, Rylant offered incredible, evasive testimony.  I thus ruled that because Rylant's proffered opinion did not pass muster under Rules 702, 704, and 403, he could not testify at trial.


April 2, 2026

                                          _____
                                              Paul S. Diamond, J.